952 A.2d 396

**Juan RIVERA**

v.

**STATE of Maryland.**

**No. 1539, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

July 3, 2008.

Gary E. Bair, Greenbelt, for appellant.

Mary Ann Ince (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, for appellee.

Panel: SALMON, MEREDITH and LAWRENCE F. RODOWSKY (Retired, specially assigned), JJ.

LAWRENCE F. RODOWSKY, J., Retired, Specially Assigned.

Appellant, Juan Rivera (Rivera), asks us to reverse the denial by the Circuit Court for Montgomery County of his petition for a writ of error coram nobis. By that writ, he sought to have the court find invalid his guilty plea to a charge

that arose out of allegations of sexual child abuse. Motivating Rivera's petition is incarceration by the United States Immigration and Customs Enforcement agency (ICE) and threatened deportation. Before us, Rivera launches many attacks on his guilty plea, none of which do we find persuasive.

There is a history behind Rivera's guilty plea. He is the father of a daughter, A.R., born February 17, 1989. Rivera is a native and citizen of Peru. Sometime prior to January 1, 1997, he entered the United States at a place and on a date unknown to ICE. About August 23, 2000, Rivera adjusted his immigration status to that of a lawful permanent resident.

In 2003, Rivera and his wife, A.R.'s mother, were engaged in a divorce proceeding in Montgomery County. On August 12 of that year, an evaluator from the Family Division of the circuit court met with Rivera in connection with custody issues in the domestic litigation. Although there were no allegations of sexual child abuse against Rivera that were known to the evaluator, he told the evaluator that his wife's allegations against him were totally made up. According to the State's proffer of proof at the guilty plea hearing, Rivera further stated to the evaluator

"that on one occasion, [A.R.] came into his room at night, and got into bed with him and his wife, [A.R.] got in between the two adults. The defendant stated, he grabbed [A.R.] and subsequently got an erection. Juan Rivera stated, that he realized it was his daughter, and pulled away."

Also according to the State's proffer, A.R., at age fourteen, was interviewed by Child Protective Services on September 12, 2003. She stated "that her father had committed an anal intercourse act with her, when she was approximately eight years old." This had occurred during 1997 in Gaithersburg. A.R.'s mother was also interviewed and, per the State's proffer, stated that Rivera "had approached her in 1997, and apologized for abusing [A.R.]. He stated he had been rubbing [A.R.'s] back and ended on top of her."

Rivera was arrested October 8, 2003. The charging document, No. 004D00137631, alleged second- and third-degree

sexual offenses and child abuse, carrying maximum potential penalties of forty-five years. The sentencing guidelines were ten to twenty-one years. By letter of November 14, 2003, to defense counsel, the State offered to accept a plea to one count of third-degree sex offense, carrying a maximum penalty of ten years imprisonment and, under the guidelines, probation to two years. Expiration date of the offer was Monday, December 8, 2003. Under defense counsel's normal procedure, copies of all communications from the State's Attorney are forwarded to the client. Rivera did not accept the State's offer.

A five-count indictment was filed against him on January 15, 2004, in Criminal No. 99237. Count I alleged sexual child abuse in violation of former Maryland Code (1957, 1996 Repl. Vol.), Article 27, § 35C. That offense is a felony, punishable by up to fifteen years imprisonment. A sentence under former § 35C could be imposed "separate from and consecutive to or concurrent with a sentence for any offense based upon the act or acts establishing the abuse." § 35C(b)(3). The second count charged second-degree sex offense, a felony carrying imprisonment for up to twenty years. The remaining counts charged third-degree sexual offense.

The original trial date for the case was June 7 before Judge Johnson, but, at the request of Rivera, trial was postponed beyond the *Hicks* date, with the approval of the administrative judge, to October 12, 2004, for trial before Judge Scrivener.[1]

Negotiations between the State and defense counsel underlay the postponement. By letter of August 12, 2004, the State offered to amend Count I of the indictment in Criminal No. 99237 to charge violation of Maryland Code (1974, 2002 Repl. Vol.), § 3–8A–30 of the Courts and Judicial Proceedings Article (CJ). That statute in relevant part provided:

"(a) *In general.*—It is unlawful for an adult wilfully to contribute to, encourage, cause or tend to cause any act,

---

1. *State v. Hicks,* 285 Md. 310, 403 A.2d 356, on motion for reconsideration, 285 Md. at 334, 403 A.2d at 368 (1979).

omission, or condition which results in a violation, renders a child delinquent or in need of supervision.

"(b) *Child need not be found to have committed viola-tion.*—A person may be convicted under this section even if the child has not been found to have committed a violation or adjudicated delinquent or in need of supervision. ...

"(c) *Penalty.*—An adult convicted under this section is subject to a fine of not more than $2,500 or imprisonment for not more than 3 years, or both. The court may suspend sentence and place the adult on probation subject to the terms and conditions it deems to be in the best interests of the child and the public." [2]

The guidelines for this offense were "probation to probation." The prosecutor's August 12, 2004 letter included the following passages:

"In previous conversations that you and I have had, there was a concern that a plea to this charge would make your client deportable. I have since had an opportunity to speak to Christine Carlson, Special Agent for U.S. Department of Homeland Security, Immigration and Customs Enforcement, who has informed me that a Contributing charge does not make a defendant eligible for deportation proceedings. It is a charge that INS does not 'look behind' as they would with a second degree assault. Please feel free to contact Ms. Carlson at 410–962–7449 to confirm this information.

---

**2.** At the time of the offense, the statute was Maryland Code (1974, 1995 Repl. Vol.), CJ § 3–831. Former CJ § 3–831 in relevant part provided:

"(a) It is unlawful for an adult wilfully to contribute to, encourage, cause or tend to cause any act, omission, or condition which results in a violation, renders a child delinquent, in need of supervision, or in need of assistance.

"(b) A person may be convicted under this section even if the child has not been found to have committed a violation, adjudicated delinquent, in need of supervision, or in need of assistance...."
The penalty section in 1997 was the same as in the 2002 Replacement Volume.

By Chapter 415 of the Acts of 2001, this statute was revised. Causing a condition that renders a child in need of supervision became CJ § 3–8A–30 and causing a condition that renders a child in need of assistance became CJ § 3–828.

"In light of the fact that your client is facing a substantial penalty should the State prevail at trial, it is the State's position that he should entertain this very generous offer to prevent his daughter any further pain and trauma that would be incurred should she have to testify. This offer is being extended to your client at this late juncture because the State is highly concerned as to the emotional well being of [A.R.]" [3]

The offer was to expire by its terms on September 14, 2004.

Negotiations continued, as evidenced by a letter dated October 4, 2004, from defense trial counsel to the prosecutor, with a copy to Rivera. The letter opened by stating:

"This letter will confirm a telephone message I left for you on October 1, 2004, as well as our discussions last week. My client remains willing to plead guilty to a charge of contributing to a condition which would place his daughter in need of assistance, § 3–828(a) of the Courts Article. He understands that this charge is a misdemeanor, and that it ordinarily carries a maximum possible sentence of three years and a fine of $2,500.00."

Maryland Code (2002), CJ § 3–828 defines the crime as follows:

"(a) *Prohibition.*—An adult may not wilfully contribute to, encourage, cause or tend to cause any act, omission, or condition that renders a child in need of assistance.

"(b) *Child need not be adjudicated a CINA.*—A person may be convicted under this section even if the child is not adjudicated a CINA."

" 'CINA' means a child in need of assistance." CJ § 3–801(g).

" 'Child in need of assistance' means a child who requires court intervention because:

"(1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and

---

3. At the sentencing hearing, the State represented to the court that A.R. was in therapy. At the coram nobis hearing, the prosecutor testified that A.R. had attempted suicide twice.

"(2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs."

CJ § 3–801(f).

Counsel's letter further stated:

"The plea offer you have made requires that Mr. Rivera not be incarcerated at the original disposition, and that his suspended sentence be less than one year in duration (360 days is the preferred sentence to prevent immigration consequences). The duration of probation is up to the sentencing judge, and I understand you will argue that it should be long enough for [A.R.] to reach age 18. My client would agree to provide assistance to [A.R.] in connection with college tuition and other expenses.

. . . .

"It is also important to the plea—and already agreeable to you—that the petition include neutral language essentially tracking the wording of the statute, and without specific allegation of sexual abuse. My client still disputes [A.R.'s] claims, but recognizes that situations within the home have contributed to her need for therapy and other support. He remains interested in her welfare, and wants to promote future family reunification. Of course, he understands that it will be a condition of probation that he have no contact with [A.R.] until and unless she initiates it."

On October 7, 2004, defense trial counsel hand-delivered to the prosecutor, with a copy to Rivera, a letter, reading in part as follows:

"As we discussed last night, I had a meeting this morning with my client to review all of the terms of the proposed plea in this case, and to obtain a firm decision of the basic issue of plea versus trial. Having just met with him, I am able to report that he is prepared to go forward with the plea under the terms outlined in my letter to you of October 4, 2004, and your response of the same date." [4]

---

4. That response is not in the record.

The agreement included a provision for Rivera to contribute to A.R.'s college tuition and for Rivera to be diagnostically examined.

. Pursuant to the agreement, the State instituted Criminal No. 101007 by a one-count information charging that Rivera "did willfully contribute to, and encourage, and cause, and tend to cause an act, and omission, and condition that rendered a child in need of assistance, in violation of [CJ § ] 3–828[.]" On October 12, 2004, the parties appeared before Judge Scrivener for the purpose of taking Rivera's guilty plea to the newly filed charge. Criminal No. 99237 was at that time postponed, ultimately until after Rivera's sentencing. The prosecutor explained the terms of the plea bargain. Defense counsel generally concurred, but further advised the court as set forth below.

> "I've made up a set of documents which I would eventually like to be incorporated in the court file, in a confidential sealed envelope, that deal with our plea negotiations. Because they set forth quite a large number of terms which we have all carefully worked out, and thought about, in this matter.
>
> . . . .
>
> "A lot of this is because of immigration consequences, and the record should reflect that my client is a permanent resident, and that some of the terms of this plea have been worked out in terms, because of his potential immigration consequences."

The court then questioned Rivera to determine whether he was entering his guilty plea freely and voluntarily. He was forty-four years old at the time and his formal education had reached university level. He was not under the influence of medicine, drugs or alcohol. The court continued:

> "Q Have you had a chance to discuss the charges in this case, as well as the terms of this plea, with your attorney?
> "A Yes.
> "Q Do you have any questions you want to ask either your attorney or the Court, before we go any further?

"A No.

"Q If at any time this morning you have a question, or want to ask either your attorney or the Court, you are free to do that at any time, and I want you to stop and ask, okay?

"A Thank you."

When Rivera answered affirmatively to the court's question whether he was on probation, defense trial counsel interrupted to correct the record and advise the court that Rivera was on pretrial supervision in the matter before the court.

The court continued the voir dire.

"Q Okay. Do you understand that you do not have to plead guilty in this case?

"A I understand that.

"Q That you have an absolute right to a trial. If you elected to go forward with the trial, which is actually scheduled for today, you have a number of constitutionally protected rights. I just want to go over those with you, briefly, to be sure that you understand what you give up when you elect to plead guilty.

"So, if you elected to go to trial, first of all you could be tried either in front of just a judge, or a judge and a jury. Your attorney would have a chance to question witnesses that the State would call, and to call witnesses on your behalf. At trial, you would be free to testify, to talk about what happened, but you have an absolute right not to testify and to remain silent. If you elected to do that, no one could think badly of you, or draw any adverse inference if you did. You could not be found guilty at trial, unless all 12 jurors unanimously agreed you were guilty beyond a reasonable doubt.

"Are you sure you want to waive all of your rights to trial and go forward with a plea of guilty?

"A Yes, I am sure."

After determining there were no promises or threats, the court turned to immigration consequences.

"Q If you are not a citizen of the United States, a finding of guilty could have immigration consequences for you. Have you had a chance to discuss that issue with your attorney, if you have any concerns about that?

"A Yes, I had the chance to discuss with my attorney.

"Q And this plea has been negotiated in light of those immigration consequences, am I right?

"A Right, yes."

The court found the plea to be voluntary and that Rivera understood what he was doing. At that point, the State proffered the anticipated testimony from the custody evaluator, from Mrs. Rivera, and from A.R., that has been reviewed above. The proffer included Rivera's version of the occurrence. Defense counsel confirmed that the statement to the custody evaluator presented Rivera's version of the events. The court entered a finding of guilty, and deferred sentencing. There was no need for a presentence investigation, in the view of the defense.

Sentencing was held on January 24, 2005, at which time the State nol prossed Criminal No. 99237. Rivera received a suspended sentence of 360 days, and he was placed on supervised probation for two years, subject to the conditions of no contact with A.R., payment of a specified minimum toward A.R.'s college tuition, and undergoing a diagnostic examination, to be followed up by therapy, if recommended.

Within ninety days of the sentencing, Rivera filed a motion to reconsider the sentence. It was held in abeyance. That motion was heard (Scrivener, J.) on January 16, 2007, at which time the court struck the finding of guilty and, pursuant to Maryland Code (2001), § 6–220 of the Criminal Procedure Article, placed Rivera on supervised probation before judgment (PBJ) for an additional seven months.

On March 23, 2007, federal authorities arrested Rivera as a result of removal proceedings that had been instituted against him. He was incarcerated at the Dorchester County Detention Center, where he apparently remains. Rivera petitioned for coram nobis relief on May 1, 2007, and the matter was

heard (Rupp, J.) on July 12, 2007. Defense trial counsel, Rivera, and the prosecutor testified.

Rivera said that, prior to his plea, he and his counsel talked "[a] lot" about Rivera's concerns over possible deportation. "[S]everal times," his counsel talked to him about his potential for deportation, and it was Rivera's understanding that pleading guilty to the contributing charge would not affect his legal status in the United States. If he had been told that his plea of guilty would result in his being deported, he would not have pleaded.

Defense trial counsel testified that a very important goal of the representation was to resolve the case in a way that would not permit Rivera to be deported. In one of his meetings with the prosecutor, she advised him that an ICE agent, Christine Carlson, had advised her that "a plea to contributing to a CINA ... would not trigger deportation proceedings even if the proffered facts suggested a sexual offense." He considered that this was confirmed in the prosecutor's letter to counsel of August 12, 2004. Further, counsel unsuccessfully had tried to reach Ms. Carlson directly, and he advised Rivera of his lack of success. Defense counsel testified that he would not have recommended the plea if he knew that what happened was going to happen. On cross-examination, defense counsel explained how, because of the "rather hidden issues" on deportation, he had consulted with an immigration lawyer. He was advised that there were no cases on the contributing to a CINA charge, but, in five states, the crime of contributing to the delinquency of a minor had been held, based on the wording of the particular statute, to be a crime of moral turpitude on which deportation could be based.

Defense counsel was asked if he had told his client that there would be no risk of deportation. Counsel replied:
"I don't have a recollection of saying there is no risk because intellectually, I believe, that immigration regulations and policies including administrations can change and you never know. So, I don't believe I would have said there is no risk. But, I can't, I really just don't have a recollec-

tion of saying that to the client and I'm inclined to think I would not have said that."

And further, he testified:

"I can't say that I said there is no risk. I'm telling you as honestly as I can that I probably would have thought in my own mind that there is always some potential risk so that if I did comment on it, I might have said, you know, it's a who knows proposition. But, I can tell you we entered the plea."

The prosecutor testified that, when defense counsel complained to her in her office that he had been unable to reach Ms. Carlson, the prosecutor reached Ms. Carlson by telephone and, with defense counsel present, placed the call on a speakerphone. Ms. Carlson advised them that, at that particular time, ICE was not looking behind contributing charges and that her request in several other contributing cases, that the agency look behind the charge, had been refused. The prosecutor said that she "would never tell a defense attorney that there is no risk that his client would get deported."

In denying the coram nobis petition, the court found that defense counsel had not guaranteed Rivera that his guilty plea would insulate him from subsequent deportation proceedings. The court observed that, at the time the plea was entered, the risk of deportation was minimal. Indeed, the court file reflected that, in the fall of 2005, Rivera had been authorized by the court to leave the country in order to travel to Peru and that he had been allowed to re-enter this country. The court found that every effort had been made to try to protect Rivera from deportation consequences, and the court was "convinced that Mr. Rivera knew there was no guarantee that it would not occur." With respect to the voir dire, the coram nobis court found that Judge Scrivener had taken the guilty plea correctly and that Rivera had been advised of his rights. Alternatively, the court held that, because of the PBJ, there was no criminal conviction, so that the court had no jurisdiction to hear the petition.

This appeal followed. Rivera presents the following questions:

"1. Did the coram nobis court have jurisdiction to hear the case?

"2. Did the coram nobis court err in denying Appellant's petition for writ of error coram nobis where the record of his guilty plea failed to comply with the dictates of Maryland Rule 4–242?

"3. Did the coram nobis court err in denying the petition where the record at the coram nobis hearing established that Appellant did not enter the guilty plea knowingly, intelligently, and voluntarily?

"4. Did the coram nobis court err in denying the petition where the record at the coram nobis hearing established that Appellant was denied the effective assistance of counsel in connection with his guilty plea?"

## I

■ The coram nobis court ruled that it had no jurisdiction to hear the petition "because there is no conviction that took place." A circuit court, however, has subject matter jurisdiction to entertain a petition for a writ of coram nobis. More precisely, the question is whether Rivera is entitled to coram nobis relief inasmuch as his judgment of conviction was stricken, and he was placed on PBJ. The answer is furnished by *Abrams v. State*, 176 Md.App. 600, 933 A.2d 887 (2007).

Abrams, in June 1994, entered an *Alford* plea[5] in a Maryland circuit court to three counts of uttering. He was sentenced to one year confinement, that sentence was suspended, and he was placed on two years probation. In June 1996, the sentencing court granted a motion to reconsider the sentence and converted it to PBJ. That probation was for one year. In 2005, Abrams pleaded guilty to a drug charge in a federal district court which sentenced him to a mandatory confinement of ten years. He was ineligible for a lesser sentence under the Federal Sentencing Guidelines because, for that

---

**5.** *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

purpose, the Maryland PBJ was considered a conviction of uttering.

Contending that his guilty plea to the state charges was invalid, Abrams sought coram nobis relief in the sentencing court. One issue on Abrams's appeal from the denial of that relief was whether PBJ was to be considered a conviction conferring standing on Abrams to seek the writ. This Court held that the detriment suffered by Abrams under the Federal Sentencing Guidelines was a significant collateral consequence, so that Abrams's PBJ should be viewed as a conviction for coram nobis purposes. We reasoned:

> "[W]hether a probation before judgment is a 'conviction' depends upon the context and purpose for which that term is used. In the context of a coram nobis petition, the term 'conviction' or 'convicted' is used to identify a person eligible for relief under the petition as one who, *inter alia,* is facing significant collateral consequences because of having been found guilty of a criminal offense. It is essentially irrelevant whether the disposition on the guilty finding is a judgment of conviction, *i.e.,* a sentence, or a stay of entry of a judgment, *i.e.,* a probation before judgment. The critical issue is whether the finding of guilt did or will in fact cause significant collateral consequences to the person petitioning for coram nobis relief. Here, appellant's probation before judgment was treated as a 'conviction' for purposes of the Federal Sentencing Guidelines and, as a result, appellant was subject to a mandatory penalty of ten years' imprisonment."

176 Md.App. at 616–17, 933 A.2d at 897.

The deportation faced by Rivera is as significant a collateral consequence of his PBJ as was the foreclosure of a lesser sentence than ten years in *Abrams.* Consequently, the fact that the charges against Rivera ultimately were resolved by PBJ does not deprive him of standing to petition for the writ.[6]

---

6. In describing the modern writ of error coram nobis in Maryland, the Court of Appeals has said that it "is available not only to correct errors

## II

Rivera next contends that the record of his guilty plea proceeding failed to comply with the dictates of Maryland Rule 4–242. He presents three aspects to the argument: (A) the plea court failed fully to advise Rivera of his constitutional rights that were being waived; (B) the plea court failed to explain the elements of the offense; and (C) there was no factual basis for the plea set forth on the record.

Maryland Rule 4–242, in relevant part, provides:

"(c) **Plea of guilty.** The court may accept a plea of guilty only after it determines, upon an examination of the defendant on the record in open court conducted by the court, the State's Attorney, the attorney for the defendant, or any combination thereof, that (1) the defendant is pleading voluntarily, with understanding of the nature of the charge and the consequences of the plea; and (2) there is a factual basis for the plea. In addition, before accepting the plea, the court shall comply with section (e) of this Rule. The court may accept the plea of guilty even though the defendant does not admit guilt. Upon refusal to accept a plea of guilty, the court shall enter a plea of not guilty." [7]

As explained below, there was no legal error, in accepting the initial guilty plea, "of a constitutional or fundamental

of fact that affect the validity or regularity of a judgment, but also to correct constitutional or fundamental legal errors for a petitioner who is not incarcerated and not on parole or probation and who is faced with serious collateral consequences of his conviction[.]"
*Holmes v. State*, 401 Md. 429, 453, 932 A.2d 698, 712 (2007) (citing *Skok v. State*, 361 Md. 52, 760 A.2d 647 (2000)).

In the case before us, Rivera was on probation, under the PBJ, at the time his petition was filed and at the time that the court denied it. No issue is raised before us on that ground in this case.

Nor is there any contention that Rivera waived coram nobis relief by failing to seek leave to appeal from his initial guilty plea. Compare *Holmes* (holding that failure to seek leave to appeal, after having been advised of its availability, creates a presumption of waiver of coram nobis relief from guilty plea). We note that the record of the guilty plea proceeding in the instant matter does not reflect that Rivera was advised of his right to seek leave to appeal.

**7.** We discuss section (e) in Part III, *infra*.

proportion" that would entitle Rivera to coram nobis relief. *Holmes,* 401 Md. at 451, 932 A.2d at 711.

## A

When taking the guilty plea, the court advised Rivera that he was waiving his privilege against compulsory self-incrimination, his right to a jury trial, and his right to confront his accusers. These were the rights referred to by the Court in *Boykin v. Alabama,* 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969). Rivera contends, however, that he was not advised on the record of the presumption of innocence or of the right to a speedy and public trial. This, he says, is now required by *Metheny v. State,* 359 Md. 576, 598 n. 14, 755 A.2d 1088, 1100 n. 14 (2000).

*Metheny* imposes no such requirement. There, in answer to a contention that the proffered factual basis for a guilty plea must satisfy the beyond a reasonable doubt standard, the Court held that the guilty plea waived " 'the right to insist that the prosecution's proof at trial establish guilt beyond a reasonable doubt.' " *Id.* at 598, 755 A.2d at 1100. In footnote 14, on which Rivera relies, the Court, in dicta, listed some of the other rights which are waived by a guilty plea. In addition to the three *Boykin* rights, the Court included the right to present witnesses, and the right to a speedy and public trial. The *Metheny* Court did not hold that a guilty plea would be invalid if the latter two rights were not the subject of advice on the record.

Factually, in the case before us, the court advised Rivera that twelve jurors would have to agree unanimously that he was guilty beyond a reasonable doubt. This embraces the presumption of innocence. Further, the court advised Rivera of his "absolute right to a trial." [8]

---

**8.** Four months before his guilty plea, Rivera waived his right to a trial within 180 days from the earlier of his or his counsel's first appearance before the court. See Maryland Rule 4–271(a). The obvious purpose of the waiver was to allow plea bargaining to continue.

## B

■ Rivera contends that under Rule 4–242(c) the court was obliged to, but failed to, determine that the plea of guilty was entered "with understanding of the nature of the charge." He equates this requirement with the plea court's explaining the elements of the offense to the accused or ascertaining from counsel whether counsel previously had explained the elements to the accused. We shall consider this contention (1) as of the time of the guilty plea, October 12, 2004, and (2) as of the time of the coram nobis hearing, July 12, 2007.

Specifically, Rivera dissects CJ §§ 3–828 and 3–801 into these six elements:

"(1) An adult

"(2) Willful[ly] contributing to, encouraging, causing or tending to cause

"(3) An act, omission, or condition rendering

"(4) A child requiring court intervention

"(5) A child who has been abused or neglected and

"(6) Parents' inability or unwillingness to give proper care and attention."

### 1

In the fall of 2004, the requirements to satisfy the guilty plea rule, particularly concerning the defendant's knowledge of the nature of the crime, were as set forth in the landmark opinion by Chief Judge Robert C. Murphy, writing for the Court, in *State v. Priet*, 289 Md. 267, 424 A.2d 349 (1981). More recently, the Court of Appeals applied *Priet* in *Lovell v. State*, 347 Md. 623, 702 A.2d 261 (1997). That was an appeal from a death sentence, based upon a guilty plea to first-degree murder. Lovell sought to have his guilty plea stricken because there was no explanation on the record indicating that premeditation, deliberation, and wilfulness had been explained to him, particularly in the distinction between first-degree murder and the intent-to-kill variety of second-degree murder.

*Id.* at 633, 702 A.2d at 265–66. Rejecting this contention, the Court said:

> "It was settled, however, in *State v. Priet,* 289 Md. 267, 424 A.2d 349 (1981), involving the predecessor to Rule 4–242(c), that the required 'understanding of the nature of the charge' is not a requirement 'that the precise legal elements comprising the offense be communicated to the defendant as a prerequisite to the valid acceptance of his guilty plea.' *Priet,* 289 Md. at 288, 424 A.2d at 359. Understanding the nature of the offense affords the defendant 'a basic understanding of its essential substance, rather than of the specific legal components of the offense to which the plea is tendered.' *Id.* at 288, 424 A.2d at 359–60. Obviously, because recital of the elements of the crime is not required, a contrasting of the elements of the subject crime with those of a related crime is not required."

*Id.* at 634, 702 A.2d at 266.

The record before the plea court when Rivera pleaded reflects that the standard under *Priet* was satisfied. The product of the negotiation, the charge of violating CJ § 3–828, was filed on Friday, October 8, 2004, and the plea was entered on the next business day, Tuesday, October 12, 2004. Proceedings opened with the prosecutor advising that Rivera was "going to enter a plea to one count, of contributing to conditions of a minor child." Defense trial counsel presented "a set of documents" to be retained under seal, that dealt with the plea negotiations. He stated the documents "set forth quite a large number of terms which we have all carefully worked out, and thought about, in this matter."

The court's questioning of Rivera included the following exchange:

"Q Have you had a chance to discuss the *charges* in this case, as well as the terms of this plea, with your attorney?

"A Yes.

"Q Do you have any questions you want to ask either your attorney or the Court, before we go any further?

"A No."

(Emphasis added).

Thus, "considering the record as a whole, the trial judge could fairly determine that the defendant understood the nature of the charge to which he pleaded guilty." *Priet,* 289 Md. at 291, 424 A.2d at 361.

**2**

At the coram nobis hearing, Rivera testified. He did not testify, however, that he failed to understand the nature of the charge to which he entered his guilty plea; rather, his testimony emphasized his concern, when pleading, over possible deportation consequences. Responding to Rivera's allegation in his petition for coram nobis that "the [plea] Court failed to adequately describe the nature of the charges to which the Defendant was tendering a guilty plea," the coram nobis court found that it was "also satisfied from the record that the nature of the charge was adequately explained to Mr. Rivera[.]"

In this Court, appellate counsel for Rivera argues that the guilty plea is invalid as a result of *Bradshaw v. Stumpf,* 545 U.S. 175, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005), and *Abrams,* 176 Md.App. 600, 933 A.2d 887. *Bradshaw* reversed *Stumpf v. Mitchell,* 367 F.3d 594 (6th Cir.2004), which had held that Stumpf, who was not a principal in the first degree, had pleaded guilty to "aggravated" murder without understanding that a specific intent to cause death was a necessary element of that crime under Ohio law. Because Stumpf's attorneys at the plea hearing had represented on the record that they had explained the elements of "aggravated" murder to him—a representation that Stumpf confirmed on the record—the Supreme Court held that the guilty plea was knowing and voluntary.

In that context, and speaking of the requirement that a guilty plea be voluntary, knowing, and intelligent, the Court said:

"Where a defendant pleads guilty to a crime without having been informed of the crime's elements, this standard is not

met and the plea is invalid. *Henderson v. Morgan,* 426 U.S. 637, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976)." [9]

545 U.S. at 183, 125 S.Ct. at 2405.

In *Abrams,* the accused pleaded guilty to "uttering" and later attacked that plea in a coram nobis proceeding. Abrams contended, *inter alia,* that *Bradshaw* required that he be advised of the elements of the crime and that it had not been done. This Court pointed out that the judge who accepted Abrams's guilty plea advised him that he was accused "of offering a forged instrument to obtain some benefit you are not entitled to[.]" 176 Md.App. at 624, 933 A.2d at 901 (italics omitted). We held that was a sufficient explanation. Discussing the precedents, this Court, in *Abrams,* concluded that *Bradshaw* had significantly restricted *Priet* by precluding reliance on a presumption that defense counsel sufficiently explained the nature of the charge. *Priet* had recognized such a presumption, based upon language in *Henderson. Abrams,* 176 Md.App. at 622–23, 933 A.2d at 900.

■ Combining *Bradshaw* and *Abrams,* Rivera argues to us that the nature of the charge here cannot be understood absent a statement of the elements of the crime. This argument was not made to the coram nobis court.[10] The conten-

---

**9.** Absent an "at" page reference, we are unable to determine specifically on which portion of the opinion in *Henderson* the Court relied. We, however, do find the following discussion, in which the petitioner is custodian of an applicant for habeas corpus relief.

"Petitioner contends that the District Court applied an unrealistically rigid rule of law. Instead of testing the voluntariness of a plea by determining whether a ritualistic litany of the formal legal elements of an offense was read to the defendant, petitioner argues that the court should examine the totality of the circumstances and determine whether the substance of the charge, as opposed to its technical elements, was conveyed to the accused. We do not disagree with the thrust of petitioner's argument, but we are persuaded that even under the test which he espouses, this judgment finding respondent guilty of second-degree murder was defective."
426 U.S. at 644, 96 S.Ct. at 2257.

**10.** The closest Rivera came to arguing *Bradshaw* to the coram nobis court was to say that the plea court "forgot to explain to the defendant the nature of the charges."

tion was not presented in the petition for coram nobis, was not the subject of evidence presented to the coram nobis court, and *Bradshaw* was not cited to the coram nobis court, either in the points and authorities presented in writing in support of the petition, or at oral argument. This Court ordinarily will not decide a question that has not been tried and decided by the trial court. *See* Maryland Rule 8–131(a).

Nor will we exercise our discretion to consider the issue. *Bradshaw* was decided approximately eight months after Rivera's guilty plea was accepted, and *Abrams* was decided two months after the coram nobis court ruled on Rivera's petition. Rivera, however, has not briefed the issue of the retrospective application of his reading of *Bradshaw* to a guilty plea accepted well before that case was decided. *See* Maryland Rule 8–504(a)(5).

## C

Rivera's remaining ground for asserting that Rule 4–242(c) was violated relies on the requirement that there be "a factual basis for the plea." The argument rests on two premises, both of which are false. The first is that, when comparing the facts to the charge to which the plea is entered, a court is constrained to look only to those facts that are admitted by the accused. Second, the argument hypothesizes that the only relevant charge is the charge to which the guilty plea is entered. From these premises, Rivera concludes that **"none** of the elements was established by the proffered facts." Brief of Appellant at 16.

"[A]s a general matter the determination of a factual basis for the plea is not constitutionally required[.]" 5 W.R. La-Fave, J.H. Israel, N.J. King, & O.S. Kerr, *Criminal Procedure* § 21.4(f), at 845 (3d ed. 2007) (LaFave) (footnote omitted). The exception is a plea under *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162. LaFave § 21.4(f), at 845. The requirement in Maryland for a factual basis for a plea rests on Rule 4–242(c), which, by its terms, recognizes that the factual basis may be derived from the State's Attor-

ney. Thus, the Court in *Metheny,* 359 Md. at 603, 755 A.2d at 1103, said:

"A trial court has broad discretion as to the sources from which it may obtain the factual basis for the plea, including a statement of facts agreed to by a defendant and the government, testimony from a defendant, *inquiry of the prosecutor or defendant's counsel, and any other appropriate source."*

It is immaterial that Rivera did not agree with the State's version of the facts. Indeed, "[t]he court may accept the plea of guilty even though the defendant does not admit guilt." Rule 4–242(c).

Before the coram nobis court, Rivera argued that the State's proffer for a factual basis of the CJ § 3–828 violation did not demonstrate "that court intervention is needed" and "that the child's custodian is unwilling or unable to provide the proper care." The argument looks exclusively to CJ § 3–828 and ignores sexual child abuse and sex offenses in the second and third degrees with which Rivera was initially charged. Where, as here, the charge to which the plea is taken has been bargained down from more serious charges, courts do not permit the defendant later to challenge a guilty plea on the ground of disparity between the facts giving rise to the criminal prosecution and the elements of the charge that results from the plea bargaining. Instead, the relevant charge for the factual comparison is the charge initiating the prosecution.

What has occurred is an evolution in the law. The factual basis requirement was added to Fed. R.Crim. Proc. 11 in 1966. *McCarthy v. United States,* 394 U.S. 459, 462 n. 4, 89 S.Ct. 1166, 1169 n. 4, 22 L.Ed.2d 418 (1969). The Federal Advisory Committee on Criminal Rules explained that the requirement was "designed to 'protect a defendant who [was] in the position of pleading voluntarily with an understanding of the nature of the charge but without realizing that his conduct does not actually fall within the charge.' " *Id.* at 467 & n. 18, 89 S.Ct. at 1171 & n. 18. Maryland Rule 4–242(c) was adopted

as part of the Rules Revision effective July 1, 1984. 1 Maryland Rules at 130 (1984 Repl. Vol.). In the succeeding years, plea bargaining has become even more commonplace, and the factual basis underlying the prosecution does not always match the offense to which the plea is taken. We now turn to how the courts have responded to that reality.

The defendant in *State v. Harrell,* 182 Wis.2d 408, 513 N.W.2d 676 (Wis.App.1994), *cert. denied,* 513 U.S. 858, 115 S.Ct. 167, 130 L.Ed.2d 104 (1994), after pleading no contest, was convicted of second-degree sexual assault of a child and third-degree sexual assault. The defendant sought post-conviction relief and contended that he was entitled to withdraw his plea because there was no factual basis for it. In the plea agreement that the defendant had negotiated, the prosecutor agreed to dismiss four counts of first-degree sexual assault of a child in exchange for his plea. The defendant argued that the victim's lack of consent was not an element of the initial crimes charged, and it was not alleged in the criminal complaint or at the preliminary hearing. He contended that there was no factual basis for the acceptance of his plea of no contest to third-degree sexual assault because lack of consent was an element of that crime. In response, the court held:

"[The defendant's] argument is that even though there is no question that the complaint and preliminary hearing testimony established a sufficient factual basis for four counts of first-degree sexual assault, the State failed to establish a factual basis for the reduced charge of third-degree sexual assault and he, therefore, should be able to withdraw his plea. We reject [his] argument.

. . . .

". . . [W]e must determine whether a factual basis was shown either for the offense which [the defendant] agreed to plead guilty to, third-degree sexual assault, or a more serious charge reasonably related to third-degree sexual assault—specifically the initial charge of first-degree sexual assault of a person who has not attained the age of thirteen. No one disputes that there was a factual basis for the more serious charge in this case."

513 N.W.2d at 680 (footnote omitted). The Wisconsin Court of Appeals concluded that the offenses were reasonably related based upon the similar language and the statutory history of the offenses. The defendant was not entitled to withdraw his plea.

Likewise in *State v. Zhao,* 157 Wash.2d 188, 137 P.3d 835 (2006), the defendant was originally charged with two counts of first-degree child molestation, but pleaded guilty to two counts of conspiracy to commit indecent liberties, even though there was no coconspirator, and one count of second degree assault. The defendant later sought to withdraw his plea because there was no factual basis for the charges. The Supreme Court of Washington held that "so long as there exists a factual basis for the original charges and the defendant's plea to the amended charges is knowing, intelligent, and voluntary[,]" the defendant may plead guilty to charges for which there is no factual basis. 137 P.3d at 836.

> "Since the factual basis requirement, both in case law and in this court's rule[,] is founded on the concept of voluntariness, we hold that a defendant can plead guilty to amended charges for which there is no factual basis, but *only* if the record establishes that the defendant did so knowingly and voluntarily and that there at least exists a factual basis for the original charge, thereby establishing a factual basis for the plea as a whole. Doing so supports a flexible plea bargaining system through which a defendant can choose to plead guilty to a related charge that was not committed, in order to avoid near certain conviction for a greater offense."

*Id.* at 841. The defendant also argued that, if a defendant pleads to an amended charge for which there is no factual basis, then the court must discuss on the record the lack of a factual basis for the ultimate charge. The Court concluded that such a colloquy was not required. *Id.* at 841–42.

In *Rollison v. State,* 346 S.C. 506, 552 S.E.2d 290 (2001), the court reversed the granting of post-conviction relief to a defendant who had pleaded guilty to various drug offenses. The post-conviction court concluded that the defendant was

not clearly informed of the charges. Finding that the defendant had knowingly, intelligently, and voluntarily agreed to plead guilty to two offenses as part of a bargain where the State would drop three other charges, the Supreme Court stated:

"A defendant may, as part of a plea bargain, agree to plead guilty to a crime for which he has been indicted (or to which he has waived grand jury presentment), but of which he is not guilty. . . . [F]or example, we held that an individual could plead guilty to voluntary manslaughter under an indictment charging him with murder, even though the facts would not support such a lesser charge.

"While the [post-conviction] judge and [the defendant] refer to the possession charge as 'enhancing' the [possession with intent to distribute] charge to a second offense, this characterization overlooks the fact that this case involves a plea bargain. As such, the agreement is governed by contract principles, and [the defendant] was free to negotiate this type of agreement."

552 S.E.2d at 292 (citations and footnote omitted).

*Downer v. State*, 543 A.2d 309 (Del.1988), involved a defendant who pleaded guilty to sexual misconduct to avoid prosecution for first degree rape. He later moved to vacate that plea on the ground that the offense "had been impliedly repealed prior to the entry of the plea[.]" The Supreme Court of Delaware affirmed the denial of defendant's motion to vacate his plea and stated:

" '[T]he practice of accepting pleas to lesser crimes is generally intended as a compromise in situations where conviction is uncertain of the crime charged. The judgment entered on the plea in such situations may be based upon no objective state of facts. It is often a *hypothetical crime,* and the procedure—authorized by statute—is justified for the reason that it is in substitution for a charge of crime of a more serious nature which has been charged but perhaps cannot be proved. . . . [H]is plea may relate to a *hypothetical situation without objective basis.*' "

*Id.* at 313 (quoting *People v. Griffin,* 7 N.Y.2d 511, 199 N.Y.S.2d 674, 166 N.E.2d 684, 686 (1960) (emphasis added)).

The Court of Appeals of New York applies what might be called a waiver principle when an accused who has bargained down a charge then attacks the conviction on the ground that the charge to which the plea was entered lacks a legal or factual foundation. Illustrative is *People v. Foster,* 19 N.Y.2d 150, 278 N.Y.S.2d 603, 225 N.E.2d 200 (1967). There the defendant was charged with first degree manslaughter. He pleaded guilty to attempted manslaughter in the second degree. Later, he challenged his conviction on the ground that he pleaded guilty to a nonexistent crime and argued that, "since no intent is required in the crime of manslaughter and since an attempt to commit a crime requires an intent to commit the crime, a plea of guilty to attempted manslaughter is logically and legally impossible." 278 N.Y.S.2d 603, 225 N.E.2d at 201. The Court of Appeals of New York concluded that "[w]hile there may be question whether a plea to attempted manslaughter is technically and logically consistent, such a plea should be sustained on the ground that it was sought by defendant and freely taken as part of a bargain which was struck for the defendant's benefit." *Id.,* 278 N.Y.S.2d 603, 225 N.E.2d at 202.

The accused in *People v. Clairborne,* 29 N.Y.2d 950, 329 N.Y.S.2d 580, 280 N.E.2d 366 (1972), had been indicted for perjury, but she was able to bargain for a plea to falsely reporting an incident to a police officer. She then appealed, contending that the facts showed that the police officer had initiated the conversation, so that she had not committed the offense of falsely reporting. The court disagreed, holding simply that "[a] bargained guilty plea to a lesser crime makes unnecessary a factual basis for the particular crime confessed." 329 N.Y.S.2d 580, 280 N.E.2d at 367.

*See also Torres v. McGrath,* 407 F.Supp.2d 551, 558–59 (S.D.N.Y.2006) ("New York law does not require a factual inquiry when a defendant pleads guilty to a lesser crime than the offense charged in the indictment."); *People v. Adams,* 57

N.Y.2d 1035, 1038, 457 N.Y.S.2d 783, 784, 444 N.E.2d 33, 34 (1982) (holding that a factual basis for the crime was rendered "unnecessary" because the defendant, indicted on felony murder charges, pleaded guilty to manslaughter in the first degree); *People ex rel. Bassin v. Isreal,* 31 Ill.App.3d 744, 747, 335 N.E.2d 53, 56–57 (1975) ("[W]e ... have decided to adopt the approach advocated by the New York Court of Appeals in *People v. Foster* [.]").

Even though the State's proffer of proof against Rivera did not mesh completely with the charge of violating CJ § 3–828 to which he pleaded, there was no violation of Rule 4–242, for the reasons stated above.

### III

Rivera next contends that his guilty plea was not voluntary "because the record at the coram nobis hearing shows beyond cavil that all of the parties to the plea, including the judge, entered into the proceeding with the understanding that [Rivera] would suffer no immigration consequences as a result of the plea." Brief of Appellant at 20.

Possible deportation is not one of "the [direct] consequences of the plea," *see Yoswick v. State,* 347 Md. 228, 238–41, 700 A.2d 251, 256–57 (1997), about which the court is directed, by Rule 4–242(c), to inquire when a guilty plea is tendered. *See Daley v. State,* 61 Md.App. 486, 487 A.2d 320 (1985). In 1999, subsection (e) was added to Rule 4–242. It reads:

"(e) **Collateral Consequences of a Plea of Guilty or Nolo Contendere.** Before the court accepts a plea of guilty or nolo contendere, the court, the State's Attorney, the attorney for the defendant, or any combination thereof shall advise the defendant (1) that by entering the plea, if the defendant is not a United States citizen, the defendant may face additional consequences of deportation, detention, or ineligibility for citizenship and (2) that the defendant should consult with defense counsel if the defendant is represented and needs additional information concerning the potential

consequences of the plea. The omission of advice concerning the collateral consequences of a plea does not itself mandate that the plea be declared invalid."

In the case before us, the circuit court complied with subsection (e).

Rivera's point is that, nevertheless, his plea was not knowing and voluntary. He testified as follows at the coram nobis hearing:

"Q ... And what did [defense trial counsel] tell you about the potential for removal or deportation if you were found guilty of that particular charge?

"A That it won't affect my legal status in this country.

"Q And were those his words or what you drew from your conversations with him?

"A (No response.)

"Q Can you remember his exact words, I guess is my question?

"A Not exactly but I understand that, I understand, basically I understand that it won't affect, it won't have any negative affect with immigration."

As set forth in the review of the facts in this opinion, defense counsel did not believe that he had told Rivera that there was no risk of immigration consequences, and the prosecutor testified that she would not have advised defense counsel that there was no risk. The coram nobis court, after reviewing the evidence, concluded:

"So, I do not believe that Mr. Rivera's plea in this case was involuntarily tendered based upon a promise to him that he would not be deported. I would also note that part of [defense counsel's] investigation reflected that he talked to an immigration attorney who advised him of other jurisdictions in which similar circumstances contributing to delinquency of a minor did, in fact, result in deportation. So, every effort was made to try to protect Mr. Rivera from the deportation consequences which he is now facing and I'm

also convinced that Mr. Rivera knew there was no guarantee that it would not occur."

██ "[W]hen a defendant challenges the validity of the guilty plea in that it was not entered into voluntarily and intelligently," the appellate court, generally, "review[s] the validity of the guilty plea as a whole under the 'totality of the circumstances' test." *Metheny*, 359 Md. at 604 n. 18, 755 A.2d at 1104 n. 18. In the case before us, the coram nobis court resolved against Rivera the factual conflict between Rivera's statement that his trial counsel told him that the plea would not affect his legal status in the United States and defense counsel's testimony that he gave no assurances against risks. Indeed, when pressed, Rivera was unable to say other than that it was his understanding that there would be no adverse effect.

Reviewing the totality of the circumstances, we conclude that the coram nobis court did not abuse its discretion in finding that the plea was knowing and voluntary. Rivera had to have appreciated that his counsel, the prosecutor, and the plea court could not control the decisions by ICE, an agency of the federal government. Immigration counsel, who was consulted by Rivera's defense counsel, was unable categorically to state whether ICE would look behind the CJ § 8–328 charge. All of the relevant factors were before Rivera when he made his decision. The fact that his subjective expectation was disappointed does not mean that his plea was not knowingly and intelligently made.

## IV

 Rivera's final contention is that he was denied the effective assistance of counsel. The argument is basically a recycling of the contention that we have considered in Part III, *supra*, namely, that defense counsel did not fully explain the immigration consequences of the plea to Rivera. The argument falls under the first step of the analysis required by *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Rivera must first show "that counsel

made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. at 2064. When reviewing a claim of ineffective assistance of counsel, a court should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* at 689, 104 S.Ct. at 2065.

In the instant matter, we are hard pressed to conceive of what more defense counsel could have done to protect his client. From November 2003 to the filing of the new criminal information on October 8, 2004, defense counsel labored to bury the sexual child abuse and sex offense charges and to put the facade of a CJ § 8–328 violation on the facts which the State was prepared to prove. The object of these efforts was to minimize the risk to Rivera of adverse immigration consequences. The record in this case does not reveal what caused the change in position by ICE from that which had been represented to the prosecutor, defense counsel, and Rivera by Special Agent Christine Carlson in August of 2004. Defense counsel, however, could not predict the future actions of ICE. Compare *Yoswick,* 347 Md. at 241, 700 A.2d at 257 (holding that parole eligibility is not a direct consequence of a guilty plea because it "depends on many factors beyond the control of the courts, ranging from diminution credits earned to the exercise of discretion by the Parole Commission").

For all the foregoing reasons, we affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED.**

**COSTS TO BE PAID BY THE APPELLANT.**